Mr. Steinberg, you've reserved a minute for rebuttal, so you've got 9 minutes out of the date. The floor is yours. Thank you, Your Honor. May it please the Court. Going to discuss two key issues today. The first is the correct group of consumers by which the district court should have analyzed this case. The second is the Polaroid factors and places in which the summary judgment standards were made. You know, it might help if you give us 30 seconds on the February 2nd letter to the Court of Appeals to see how it affects the argument that we're having now. You don't have to do much, but it would be nice to know where it fits in. Yes, Your Honor. That proceeding is somewhat separate from the appeal, and I'm not sure it's dispositive of any issue. But the registration of a mark does create a certain amount, I think a relatively small amount, but some amount of deference to the decision of the USPTO. And in this case, I think, you know, the extent to which it's a default judgment, there was no one there. No one there was making that decision. And I know that my adversary is going to raise the issue that he never received notice of that. But, so I don't think it's a hugely dispositive issue, but I did feel... So we should basically, we should basically, for present purposes, we should just ignore it and go forward and then worry about it afterwards. I think that's probably correct, Your Honor. I did think the Court was entitled to know about the other proceedings that were proceeding in parallel, which is why we submitted the joint letter. If I could move back to my argument, the... Please. The district court's decision fundamentally identified the group of consumers for Reply All's software product as advertisers and sponsors. And I think that was an error. I think when you're dealing with internet companies where the primary product is essentially free and what you're trying to capture are user views and user attention, and then convert that into advertising dollars, the relevant group of consumers who should have been analyzed are people who read Reply All's content online, people who are looking at the content as it appears on its own and other websites. I think this business model is fundamentally the same as companies like Facebook and Twitter, where you have user-generated content, which is then being used to capture eyeballs and capture reader attention, and then translate that into advertising dollars. It's a slightly unconventional posture, given the history of the Lanham Act, when you don't have a literal point of purchase. But it would be, I think, sort of absurd to claim that a company like Twitter or a company like Facebook is not entitled to protection in the marketplace for its mark relative to actual users. And we've seen examples, for instance, the Facebook v. Teachbook case, where Facebook is suing people because they are trying to capture users who would otherwise go to Facebook. If you look at the district court's analysis, in almost all of the Polaroid factors, it with reference to sponsors of Reply All's content. It did not work very well. There may be that, but what about the products themselves? It seems to me that they're very different, and also that there's no likelihood of bridging the gap. You're right. But the products are totally different, and there's no chance that there'll be likelihood of confusion or dilution of value due to reputation. It seems to me that there's no problem. In fact, my understanding is that Gimlet's product, if anything, enhances the reputation of your client. Well, respectfully, Your Honor, I disagree with the idea that these are two fundamentally different products. I think they're competing for the exact same use case in certain ways. People who listen to podcasts or consume media on the Internet, I think, are fundamentally similar. And I think, as a simple hypothetical, if someone said to you, there is a Facebook podcast or there is a Twitter podcast, you would likely assume it was related to the actual software that underlies Facebook and Twitter. I think if I understand the second part of your question about enhancing the reputation, it may be the case that people are associating my client's product with a high-quality podcast, but that goes to the loss of control over its reputation and its loss of ability to maintain and to develop traction along those lines. But returning, I think, to the question of how different these products are, I think that's an open question of fact. I think the idea that Internet users are necessarily only listening to podcasts and would never consider blog-style formatting or asynchronous conversation is a question that should have been resolved at trial and could not have been inferentially, based on the record in summary, judgment against my client. It doesn't seem to me that Internet users can be the determinative just in itself, per se, because everybody uses the Internet. Yes, Your Honor. Oh, I'm sorry. Excuse me. We're talking now about a mechanism, the Internet, in which people can buy different products, can utilize different products, and that have no relationship to one another. Your Honor, I think that would be right in a conventional sense if my product was, say, if my client was selling widgets as opposed to furniture, and the fact that they were both on the Internet would certainly not be dispositive in that case. But here we're talking about media content on the Internet directed at similar markets, similar audiences, and similar people, and you see it in the examples of confusion where Internet user forums, Twitter users, are, in fact, confusing the two. And of course, the Polaroid factors are only used when there's no direct competition. So they're confusing the two only in the sense that they see the name, and they call up one of the companies and say, are you the company that does X? And they say, no, we don't have anything to do with that. That's the end of it. I mean, that happens all the time. Somebody gives you a name of some store, and you Google it, and you get the name of the store, and you call and say, well, do you sell bicycles? And they say, no, no, no, no, no, we sell flowers. And that's the end of it. That doesn't count as confusion, does it? Respectfully, Your Honor, I don't think that's quite right. I think when you look at the examples, for instance, of Twitter users tagging one when they meant to tag the other, or making Facebook posts, and in those cases, we're even looking at sponsors, advertisers, and people who use Reply All products. But it leads to a second question, which is, Gimlet has argued that these are simple typos or misdirected posts. But in the context of media on the internet, this is precisely where we would expect to see confusion. It's among this user base that we would expect to see people mistaking one for the other, or confusing one for the other, and thinking that there's some association between the two. So I don't think it's simply the case of calling up one company and finding out that they're in a totally different space. I think it's an example of two companies operating in a fairly similar space, and people being confused about the association between the two. Timer, can I change gears? Judge Kuntz granted summary judgment on the federal claims, and then did the same with the state claims, but without really any discussion about supplemental jurisdiction. And I'm just curious, is there diversity here? There is diversity, Your Honor. Reply All is incorporated in Delaware and is currently based in Israel, whereas Gimlet, I believe, primary offices are in the Eastern District. I actually can't remember offhand where they're registered. So I think one is a citizen of Delaware, and one is a citizen of New York for these purposes. So I don't think, you know, I probably should argue that there's an issue with supplemental jurisdiction, but I don't actually think that's an issue before this court. All right. I just wanted to make sure that you had that. Absolutely, Your Honor. I understand. I'm almost out of time, but the final thing I would like to talk about is the similarity between the two marks. Because the district court's analysis here was fundamentally that the marks are fundamentally dissimilar, except the two marks are orally identical, which in the case of a podcast is likely to be an important issue because the podcast name is going to be said aloud most of the time. They both use double arrows, and they're often going to be viewed in the context of mobile devices or on the internet, where some of the small distinctions, like the fact that the arrows point in opposite directions, are going to be less salient. At the summary judgment phase, when you have two logos that are so similar, I think it was error for the district court to find, as it did, that there was no similarity. Also point out that in the record is the fact that in negotiations to create a license, Gimlet refused to give up the Twitter handle for reply all. At the very least, the logical inference for that is that Gimlet was concerned about the possibility of confusion, because there's no other reason when they say they're going to retire the handle, not to give it over to reply all who wants to use it, unless they think there's some possibility of confusion in the internet space. I think to enter those findings of fact that this report entered on similarity in particular merit reversal, and I can see that I'm out of time. You can answer the question. So, you know, in terms of similarity, I think it was a very clear error on behalf of the district court to enter a finding that there is no similarity between two almost identically named media companies that use fundamentally similar marks. Okay, well, you reserved a minute for rebuttal. So we'll hear now from Mr. Strand for 10 minutes. You're muted. Good morning, Your Honors, and may it please the court. John Strand representing Gimlet Media. Before I start, I just want to answer Mr. Sacks question regarding, excuse me, Judge Sacks question regarding the finding. You see, that's a perfect example of having miscalled me. I'm often, people often send me, missend letters to me as Mr. Sack, Mr. Sacks, Judge Sacks, and I'm not sure what to make of that kind of an error in this particular context of sending some communication to the wrong reply all. I think that's a great point, Your Honor, and especially in the context of, you know, Mr. Steinberg raises issues of confusion on Twitter and such. There are hundreds of companies out there that may want reply all as a Twitter handle. In fact, there is another, there are other registrations for reply all on the trademark register, including for a comic strip that is obviously different completely than either of the parties in this dispute. If we're just merely looking at people mistagging while they're on their phone, walking on the street, doing Twitter, the trademark law would fall apart. You can't, Domino's sugar and Domino's pizza couldn't exist because they both may have Domino's similar Twitter handles. That isn't leading to actual, any kind of actual confusion, and at most it raises a level of de minimis that is not cognizable here. At base, this is really a simple case. The district court correctly granted summary judgment of no infringement, finding that when evidence to show there's a likelihood of confusion between the parties. And that's the key here. Even though Gimlet was the moving party on summary judgment, that did not and does not relieve reply all corporation from submitting evidence to substantiate its claims, and it simply failed to do so. The case at base comes down to a plaintiff that believes it has a trademark registration, and that registration gives them a right to exclude others from using that mark, no matter how, no matter what goods or services, no matter the form. And that's simply not the law. The district court correctly found all the Polaroid factors being Gimlet's favor or neutral. Starting with the Polaroid factor on the strength of the mark, the district court found that the mark itself is weak, and that was the correct conclusion, finding this factor in Gimlet's favor. As your honors know, there's two ways of analyzing under the Polaroid factors. The strength of a mark, you look at the inherent strength, which is the spectrum between a generic mark and a fanciful mark, and the district court found it more towards the generic section in the suggestive, kind of towards the middle, towards the end. And that's correct. The first reply all conceded below during summary judgment briefing that the mark is suggestive, and it's a logical conclusion. The founders of reply all came up with the idea for their software product to be able to publish emails when they were emailing each other and said, hey, can we publish these things on the web? And obviously, reply all is suggestive of the ability to show email-like conversations on the web. Also, the district court correctly concluded that it's a commercially weak mark. Reply all failed to come forth with any evidence of any revenue whatsoever, really, barely a few thousand dollars in around 2015, but that's it. And also, that they've just committed no resources towards advertising or marketing and promoting the mark for their software company. Let me ask you just a real simple question, because I'm simple. And that is, reply all is such a common, who hasn't in the last week mistakenly hit the reply all button and been embarrassed by it? Reply all is sitting there looking at us, it's a creature of the devil, I think, but it's sitting there looking at us every time we go online. And I think that it's common now as a word like pandemic. How does that fit in, if it does at all? How does that, if I'm right, does that fit into the analysis or not? It does, because I think it shows that more customers or consumers, whoever they may be, are going to be more particular and questioning about which reply all they're going to. There's plenty of cases out there. I'm talking about if you have a crowded field of marks, obviously, consumers are going to be more diligent in deciding which entity they're actually interacting with or making purchases from. Same can be said here with reply all. It's a common mark, and they can look at you and say, hey, actually, which organization or company am I interacting with here and making purchases? And that's similar here. You have two non-competitive entities, Gimlet using reply all for podcasts, another entity using reply all for software for being able to publish emails on the web, basically, and consumers can easily make that distinction between the two. And that also, that difference is made easier also by the way the different parties use the marks. The district court properly analyzed the similarities between the marks and holistic view and how they're used in the marketplace and relied on two main differences. First, Gimlet places its name along with reply all mark when it's using the reply all mark. And as this court has found in courts, in other cases, when there's a housemark associated with the market issue, that will help eliminate a likelihood of confusion between the parties because they're going to assume that the reply all is associated with Gimlet, not with some other company. The tagline also that's associated with the reply all mark makes this case even stronger. It says, a show about the internet. A reply all corporation is obviously not putting on shows. It's publishing emails and allowing for people to publish emails on the web. That's not a show. So, when a consumer sees a reply all mark that says a show about the internet, they're obviously going to conclude that there must be some kind of show and look into it and see if it's a podcast, of course, which is different between the two. And that really gets to the point that these services aren't competitive. They are in different contexts and different marks. First, there is the way that these things are distributed and seen with and consumed by the public or others. The reply all podcast is basically only available in distributed platforms like iTunes and Spotify. The web is actually not its main means of distribution. Yes, of course, like every other company in the world today, reply all has, excuse me, Gimlet has a website in which reply all is available. But that's not the way most people are consuming the podcast on a daily basis. They're getting into these distributed platforms where reply all corporation simply has no product and isn't present. So, this won't simply be confused that way. And there's simply, again, a failure proof on reply all corporation's part to show that even consumers, if you're looking at them, are going to associate this software company, even if it's for publishing, with a podcast and vice versa. Mr. Steinberg talked about Twitter and Facebook. Put aside for the fact that those are very famous marks and the analysis over a very strong and famous mark is completely different than we're talking about a weak mark here. The other issue is Twitter and Facebook, to my knowledge, don't have podcasts. So, people, consumers don't believe that a Twitter and a Facebook are going to come up with podcasts. So, they wouldn't associate a podcast with a, even if reply all is like a Twitter or Facebook, assuming there's going to be association between the two of them. There's just no evidence of that anywhere. And that point is most clear also in the bridging the gap factor of the Polaroid factors, which a district court also found to be in Gimlet's favor. Reply all simply didn't put forth any evidence that they're going to bridge the gap between their publishing software and going to a podcasting type company. Next, on the element of actual confusion, the district court properly found this to be neutral. In fact, this factor could be very much in Gimlet's favor. The procedural posture of this case is important when looking at this factor. Yes, we're at summary judgment, but you have to remember that this case was pending for five years with many years of discovery before summary judgment was granted. Despite that, reply all, again, didn't do the work and didn't come forth with the evidence, be it a declaration, the name of a person for deposition, to actually testify about being confused. The record is simply wholly insufficient to show that there is actual confusion out there. At best, it's de minimis or simple inquiries like Judge Walker referred to of asking the question, hey, are you associated with the Gimlet podcast reply all, which is not evidence of actual confusion, but simply just an inquiry. Mr. Stank, can I just ask you, I'm not sure you answered Judge Stack's initial question, which was what is your take on the relevance of the cancellation of your trademark? Sure. At this point, it has no relevance or honor. The Gimlet, whether it has a registration, a registered trademark at this point is irrelevant. The initial issuance of the registration is relevant to the fact that it goes to not only Gimlet's good faith. Obviously, if the trademark office is going to agree that there's no likelihood of confusion, that just reemphasizes all the other evidence of good faith that's in the record. But it also just points to it's a government agency that is there to evaluate this exact question of likelihood of confusion between marks and properly issue them. So we can go ahead as far as you're concerned and decide the appeal one way or another without waiting for the outcome of the motion that's pending before the patent office? Absolutely, Your Honor. It has no relevance in this actual appeal. All right. Okay. Thank you, Mr. Strand. I think that's your time, but we have your brief. So, Mr. Steinberg, you've got a minute of rebuttal. Thank you, Your Honor. I can keep this very short. I just want to discuss one issue raised by my adversary, which is the idea that these compete in different channels because one is available through iTunes or Spotify, whereas my client's product is generally found on the web. I think that is something of a difference without distinction. And I think this is fundamentally a matter of fact that the district court could and should have analyzed, which is the extent to which you users are perceiving or caring about which particular internet protocol they're receiving the content through. Oh, but wait a minute. Wait. I mean, Gimlet's customers are listening to a podcast. That's the vast majority of their customers. And then there's advertisers who want to get access to those listeners. Your services are embedded within a web page of a third-party website, and that's how people access it. And it's a different function altogether, isn't it? I don't know that that's true, Your Honor. I think it's a matter of fact as to how and when listeners interact with this. I don't think it's been resolved on the record whether people who listen to podcasts are doing it exclusively or in a totally different context. Also note that Gimlet does publish transcripts of its material, publishes material on the web, and I think consumers of media tend to be relatively indifferent as to the particular format in which they receive it. But I think the broader point that I'm trying to address is just the idea that there's a opening their browser and looking at reply all content versus someone going onto their phone, opening iTunes or Spotify, and going to Gimlet's content. I don't think that's a meaningful distinction within the context of how consumers interact with media. I see that the time has stopped. Wouldn't that have been that easy to do, right? But the wrap-up time, the clock has stopped. America. All right. Mr. Steinberg, anything else you wanted to say? No. Thank you, Your Honors. Okay. Well, we've got your briefs. We will reserve decision. Thank you both. That concludes our arguments for today. Thank you again for your patience after last week. So before we adjourn for the day, let me just thank Ms. Rodriguez, our courtroom deputy. Let me also thank the technical folks who are behind the scenes and making sure this works smoothly as it did today. We're very fortunate to have them. This has been a trying time for the court, but I think I'm very proud of the way we've managed to pull this off. And it's in no small part because of the technical expertise of people who support our operation. So with that, Ms. Rodriguez, you can adjourn us and we'll end for the day. Court is adjourned.